UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| LAURA BROADSTONE, JULIE BOESCH, and RENEE BOESCH, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 15-1453 |
| SHERMAN'S PLACE, INC., | )<br>)<br>) |
| Defendant. | ) |

## ORDER AND OPINION

Now before the Court is Defendant's Motion [31] for Summary Judgment as to Plaintiff Laura Broadstone. For the reasons set forth below, Defendant's Motion [31] is GRANTED in part and DENIED in part.

### BACKGROUND[1]

Defendant, Sherman's Place, Inc. ("Sherman's"), is a corporation in the business of selling appliances, electronics, furniture, and mattresses. Sherman's has stores in Peoria, Normal, and Peru, Illinois. Plaintiff, Laura Broadstone, began working for Sherman's in Peoria on February 14, 2011 as a commission-based sales professional. During her tenure at Sherman's, Broadstone consistently ranked among the top salespeople. Like her co-Plaintifffs, however, Broadstone's relationship with other Sherman's employees was more complicated.

One of those employees was Jim Torok. Torok, one of Sherman's store managers, was not particularly liked by most Sherman's employees. Broadstone complained about Torok to another Sherman's manager, Tony Hnilicka, on February 6 and March 6, 2014. According to Broadstone,

---

[1] The following facts are culled from Defendant's Statement of Facts, Plaintiff's Additional Material Facts, and the depositions and other exhibits in the record.

she told Hnilicka that she was having a problem with Torok treating her different than he treated other men, making humiliating and rude comments to her, and not splitting commissions with her. Doc. 36-2 (Broadstone Dep. at 133). Broadstone testified that Hnilicka responded to her complaint by stating that she was not being treated differently than men. Broadstone Dep. at 135. Broadstone also complained to Hnilicka about Torok on March 6, 2014. Plaintiff testified at her deposition that she again complained to Hnilicka about Torok treating her differently than male employees and also complained that Torok interfered with her attempted sale of furniture to a customer Broadstone had worked with in the past. *Id*. at 146–49.

On March 24, 2014, Broadstone told Assistant Manager Paul Dan Stein that she wanted to speak with Hnilicka and Human Resources Manager Renee Boesch about Torok treating her differently than men. *Id*. at 160–61. She also told Stein that other salespeople—Josh Osterman, Joe Moon, Roger Bauer, Jeff Brooks, and Dennis Farney—witnessed Torok's conduct and would be able to vouch for her claims. *Id*. at 170–73. Stein informed Hnilicka and Boesch that Broadstone was complaining about Torok picking on her, but he did not mention Broadstone's complaint that she was being treated differently than men. Boesch and Hnilicka proceeded to interview five or six of the salespeople Broadstone listed. Doc. 29-1 (R. Boesch Dep. at 196–97). According to Boesch, Hnilicka led the interviews and asked the salesmen whether Broadstone was the problem, to which some agreed. R. Boesch Dep. at 197. On March 28, 2014, Boesch and Hnilicka decided to discipline Broadstone for "complaining about multiple team members to multiple team members," being disruptive in her conversations, and not going to Human Resources. Doc. 31-1, at 95 (Employee Transaction Form).

On April 29, 2014, Hnilicka received a telephone call from a customer who was upset about a mattress Broadstone recently sold to him. Willie Oliver, another Sherman's salesperson,

2

was present and heard Hnilicka's side of the phone conversation with the customer. According to Hnilicka, the customer claimed that Broadstone represented that the clearance mattress was only tried out in the store and that it was discounted simply because it was the last year's model. Doc. 31-3 (Hnilicka Dep. at 36–37). The customer complained that Broadstone lied in order to sell him a used mattress because when it was delivered it was dirty and had markings on it. Hnilicka Dep. at 52. The stock keeping unit ("SKU") for the mattress indicated that it was a "satisfaction" mattress, meaning that it had been purchased and returned by a customer who was not satisfied with it. Broadstone admitted at her deposition that she did not see that the mattress was a satisfaction mattress. Broadstone Dep. at 342. However, Broadstone also testified that the words "never used" were written on the mattress tag, and that she explained to the customer that she was unsure why this particular mattress was on clearance. Similarly, Oliver testified that he went to look at the clearance mattresses immediately after the incident and observed four mattresses with "never used" written on the tags. Doc. 36-3 (Oliver Dep. at 34); Doc. 36-1, at 3 (photograph of a mattress tag with "never used" written on tag).

Hnilicka resolved the customer's complaint by replacing the half-price clearance mattress with a new mattress at no additional charge. Hnilicka then informed Boesch that a customer had called in and reported that Broadstone lied by selling him a used mattress she was pretending was a new mattress. Hnilicka and Boesch met with Broadstone on May 1, 2014, provided her with an Employee Transaction Form, and terminated her employment with Sherman's. See Doc. 31-1, at 97 (Employee Transaction Form). Sherman's stated in the Employee Transaction Form that, "[b]ased on the customer's very detailed knowledge of what our sales terminology was, we feel that Laura blatantly violated procedure to increase her sales.

3

We are therefore terminating her employment effective immediately." *Id*. At his deposition, Hnilicka testified as follows:

> Q. Did Laura ask you to take you down to the mattress area and show you the mattresses there to explain what had happened?
> A. I believe.
> Q. Did you go down with her and look?
> A. No.
> Q. You didn't believe—it was serious enough [for] you [to] believe it warranted termination, correct?
> A. Yes.
> Q. But you didn't think it was necessary for you to hear Laura's side of the story and have her show you the mattresses that were down there that were similar?
> A. No. There may have been similar mattresses, but that mattress that is in question for the sale that was in question was already gone and the decision had been made.
> A. Well, without going down there and look[ing], you wouldn't know for sure whether there weren't similar mattresses, substantially similar mattresses, to the one that was the subject of that transaction with the customer, Carl Arrenius?
> 
> \*\*\*
> 
> Q. Well, what if you'd seen other mattress tags that had "never used" like that Exhibit 10 I showed you? You want to see it again, the photograph?
> A. You're asking what if I saw something that said "never used" on it, what would my response have been?
> Q. Yeah.
> A. Never used really is not something that was commonly on those. We rely on the designation within the skew [sic] that the salesperson enters in to know whether or not a mattress was uncrated, was clearance, or was satisfaction. Anyone at any point in time could handwrite never used on something, and that was not something that was commonly on items ….
> Q. Of course, you wouldn't know if there were any others down there because you never went and looked at the time she offered to take you; is that true?
> A. I would know from walking the floor, knowing what's in my clearance department, but I did not go downstairs with Laura at that point in time, no.
> Q. What I'm saying is: If there were other pieces of paper that had never used written on them, that would be consistent with what Laura said, that they were never used, correct?
> A. Could be, yes.
> Q. But you never considered that possibility? Did you or did you not consider that possibility.
> A. I considered that possibility when speaking with the customer, Carl Arrenius and his wife, but never used was not something that we wrote on things and could trust as a—

Hnilicka Dep. at 46–49.

Renee Boesch testified that she had recently recommended that a male Sherman's employee be terminated for stealing, so "when they told me that what Laura had done was stealing, I thought that was—that that's a no-brainer because we're going to treat people evenly. Doc. 29-1 (R. Boesch Dep. at 220–221). However, Boesch also testified that, in hindsight, she "didn't realize the situation was as gray as it actually was" and that "there are far more shades to what happened there." R. Boesch Dep. at 221.

## **LEGAL STANDARD**

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In resolving a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

In order to withstand a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When presented with a motion for summary judgment, the court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). If the evidence, however, is "merely colorable, or is not significantly probative or merely raises 'some metaphysical doubt as the material facts,' summary judgment may be

granted." *Liberty Lobby*, 477 U.S. at 249–50. Thus, in order to overcome the undisputed facts set forth in a defendant's motion for summary judgment, a plaintiff cannot rest on the allegations in his complaint but must point to affidavits, depositions or other evidence of an admissible sort that a genuine dispute of material fact exists between the parties. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

## DISCUSSION

### (1) Discrimination

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). Discrimination claims based on discrete acts are often analyzed under the direct or indirect methods of proof, though the legal standard is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Under the direct method, a plaintiff can "avoid summary judgment for the other party by creating a triable issue of whether the adverse employment action of which she complains had a discriminatory motivation." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 721 (7th Cir. 2005) (internal quotations omitted). A plaintiff may use circumstantial evidence to establish discriminatory motivation under the direct method. "Circumstantial evidence comes generally in three flavors: (1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently, or (3) evidence that the employee was qualified for the promotion and passed over and the employer's reason for the difference in treatment is a pretext

6

for discrimination. *Volovsek v. Wisconsin Dep't of Agr., Trade & Consumer Prot.*, 344 F.3d 680, 689–90 (7th Cir. 2003) (citing *Troupe v. May Dep't Stores*, 20 F.3d 734, 736 (7th Cir. 1994)).

Under the indirect, or *McDonnell Douglas* burden-shifting approach, "the plaintiff has the initial burden of establishing that (1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017) (internal citations omitted). "If the plaintiff satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id*.

Here, Broadstone has produced sufficient circumstantial evidence to create a triable issue of whether her termination was motivated by discriminatory intent. *Rudin*, 420 F.3d at 721. First, the timing of Broadstone's termination was suspicious. Her termination came shortly after she was disciplined for complaining about unfair treatment (and perhaps discrimination) by Torok. In response to her complaint, Sherman's, via Hnilicka, interviewed and asked salesmen whether Broadstone was the problem. Sherman's determined that Broadstone was the source of the problem without ever talking with her, as evidenced by her March 28, 2014 Employee Transaction Form. Doc. 31-1, at 95. Broadstone also testified that Hnilicka dismissed her previous complaint about Torok treating her differently than men because Torok had "never lied" to him.

7

The circumstances surrounding Broadstone's termination are also suspicious. Broadstone was terminated for misrepresenting the condition of a mattress to a customer. According to Oliver, although managers usually sided with the salespeople when customers called to complain, when Broadstone's customer called, Hnilicka immediately sided with the customer and "threw Broadstone under the bus." Hnilicka also ignored Broadstone's explanation that the words "never used" were written on the mattress tag and did not bother to go look, since "the decision had [already] been made" and "never used" was "not something that was common on those." Hnilicka Dep. at 46–49. On the other hand, Oliver testified that he saw four clearance mattresses with "never used" on the tags immediately after the incident and took a picture of one. Jeffrey Brooks also testified that he saw clearance mattresses with "never used" on them. Doc. 36-4 (Brooks Dep. at 66).

Lastly, Sherman's justified Broadstone's termination for the mattress debacle by assuming that Broadstone purposely deceived a customer in order to increase sales or to receive a larger commission, but the record evidence before the Court casts doubt on either motive. It appears that Sherman's commissions for clearance mattresses were marginally higher than for new stock, but even so, it is hard to understand why a commission-based employee would purposely steer a customer away from purchasing a $3,200 mattress in order to sell them a $1,500 mattress. See, e.g., Doc. 31-3, at 29 (commission summary). Taken together, Broadstone has shown "suspicious timing, ambiguous statements, behavior towards other employees and so on" giving rise to an inference of discrimination. *Volovsek*, 344 F.3d at 689–90. Viewing the evidence as a whole, a reasonable juror could conclude that Broadstone's sex caused her termination. *Ortiz*, 834 F.3d at 765.

**(2) Retaliation**

Title VII "prohibits discriminating against an employee 'because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.' " 42 U.S.C. § 2000e–3(a). Courts in this Circuit have recognized two methods of proof for retaliation claims. In order to succeed under the direct method on her Title VII retaliation claim, Plaintiff must "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 382–83 (7th Cir. 2016) (citing *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010)). Under the indirect method, a plaintiff must prove that she "(1) engaged in a statutorily protected activity; (2) met h[er] employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Turner*, 595 F.3d at 688 (internal citations omitted).

Here, a dispute of fact exists as to whether Broadstone complained about being treated differently because of her sex. Her termination came shortly after her last alleged complaint of discrimination, for which she received a disciplinary write-up. Plaintiff has also produced some evidence that Torok treated Broadstone less favorably than other salespeople and Hnilika treated the customer complaint about Broadstone as true when customer complaints about other salespeople were looked upon with skepticism. Finally, that write-up was used in part to justify her termination. Under either method of proof, Plaintiff has identified material factual disputes with respect to her retaliation claim sufficient to survive summary judgment.

**(3) Illinois Sales Representative Act**

Plaintiff does not respond to the arguments in Defendant's Motion regarding her Illinois Sales Representative Act commission claim. Pursuant to Local Rule 7.1(D)(2), her failure to respond is deemed an admission. Summary judgment is therefore granted in favor of Defendant on Plaintiff's commission claim.

## CONCLUSION

For the reasons set forth above, Defendant's Motion [31] for Summary Judgment is GRANTED as to Broadstone's Illinois Sales Representative Act claim and DENIED as to Broadstone's discrimination and retaliation claims.

Signed on this 12th day of December, 2017.

s/ James E. Shadid
James E. Shadid
Chief United States District Judge